UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NORAH FLAHERTY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>HELLO PRODUCTS LLC,<br><br>　　　　Defendant. | Case No. 1:23-cv-01990<br><br>Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

　　This is a case about toothpaste. From plaintiff Norah Flaherty's perspective, it is also a case about deception. For now, however, it is primarily "a case about federalism," *Coleman v. Thompson*, 501 U.S. 722, 726 (1991), and about "the principle of separation of powers that underlies our tripartite system of government," *Mistretta v. United States*, 488 U.S. 361, 371 (1989). More specifically, it is a case about jurisdiction, which is the "first question in any case." *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 876 (7th Cir. 2020). In this case, it is also the last.

## BACKGROUND

　　At the pleading stage, the court "accept[s] all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

　　Defendant Hello Products LLC[1] ("Hello") "manufactures, advertises, markets, sells, and distributes" personal care products—including, as relevant here,

---

[1] In a recently filed Local Rule 3.2 Notification of Affiliates, Hello's counsel informed the court that Hello Products LLC was dissolved in September 2024, with all of its assets and liabilities assigned to Colgate Palmolive Company, [33] ¶ 2. Before its dissolution, Hello was organized under the laws of Delaware, and Colgate Palmolive was its sole member. [1] ¶¶ 18–19. Under Delaware law, "[u]pon dissolution of a limited liability company and until the filing of a certificate of cancellation . . . the persons winding up the limited liability company's affairs may, in the name of, and for and on behalf of, the limited liability company, prosecute and defend suits . . . ." 6 Del. Code § 18 803(b). And under the Federal Rules of Civil Procedure, when "an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). Because the court has not received a motion to substitute Colgate Palmolive for Hello as defendant, the court proceeds with Hello as the defendant.

toothpaste. [13] ¶ 7.[2] Its products include eighteen different toothpastes listed in the complaint, which were "labeled, marketed, and advertised as containing no artificial sweeteners." *Id.* ¶ 8. The front labels on these toothpastes expressly state "no artificial sweeteners." *Id.* ¶ 9. However, they contain sorbitol and xylitol. *Id.* ¶ 8. Though sorbitol and xylitol are not mentioned on the front of the packaging, they are listed as inactive ingredients on the back. [18-3] at 4.[3]

Sorbitol and xylitol are both produced using a process called hydrogenation. [13] ¶¶ 20, 26. "Hydrogenation is a synthetic reaction . . . between hydrogen gas and an unsaturated double bond in a molecule." *Id.* ¶ 16. For hydrogenation to occur, the temperature must be between 212- and 302-degrees Fahrenheit, and the pressure must be between 98 and 148 times the standard atmospheric pressure. *Id.* ¶ 18. A metal catalyst (typically nickel, molybdenum, palladium, or platinum) must also be present. *Id.* Hydrogenation "chemically alter[s]" the natural substances on which it operates. *Id.* ¶ 19. Sorbitol results from hydrogenation of starch or glucose syrups. *Id.* ¶ 20. Xylitol results from hydrogenation of xylose. *Id.* ¶ 26.

On January 7, 2023, Norah Flaherty purchased one of Hello's toothpastes from a Target in Chicago. *Id.* ¶ 13. The toothpaste she purchased, like the other products at issue here, included a label reading "No Artificial Sweeteners." *Id.* ¶ 14. Flaherty chose this toothpaste because of this labeling. *Id.* ¶ 15.

Sometime thereafter, Flaherty learned that the toothpaste she had purchased contains sorbitol and xylitol, and she filed a class action suit in the Circuit Court of Cook County on February 21, 2023. [1-1] at 4. As later amended, the complaint alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS § 505/1 et seq. [13] at 14.[4] Flaherty also brings claims for common-law fraud and unjust enrichment. *Id.* at 16, 18. She seeks relief on behalf of herself and others similarly situated, a proposed class she defines to include "[a]ll persons within the United States who purchased the Products within five years prior to the filing of the original Complaint through the date of class certification," *id.* ¶ 47, as well as a proposed Illinois sub-class, *id.* ¶ 48.

---

[2] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

[3] The amended complaint does not mention that sorbitol and xylitol are listed on the back of the packaging. However, the packaging is referenced in (and a portion of it is attached to) the amended complaint. [13] ¶ 33; [13-1]. In addition, the packaging is central to Flaherty's claims, which hinge on the allegedly misleading nature of the packaging. Thus, the entire packaging is considered part of the complaint for purposes of the motion to dismiss. *See Venture Associates Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

[4] This description in this paragraph describes both the amended complaint, [13], which was filed in this court, and the initial complaint, [1-1] at 4–20, which was filed in state court.

Hello was served with Flaherty's complaint on February 27, 2023. [1] ¶ 5. On March 29, 2023, it filed a notice of removal, invoking this court's jurisdiction under 28 U.S.C. § 1332(a). *Id.* ¶ 33.

Subsequently, Flaherty filed an amended complaint, [13], and Hello filed this motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject-matter jurisdiction and failure to state a claim, [18]. Hello argues that (1) all of Flaherty's claims should be dismissed because no reasonable consumer would be misled by the "no artificial sweeteners" labeling, (2) Flaherty's common-law fraud claim should be dismissed because it does not meet the heightened pleading standard of Rule 9(b), (3) Flaherty's unjust enrichment claim should be dismissed because Flaherty has not shown that her legal remedies are inadequate, (4) Flaherty lacks Article III standing to seek injunctive and declaratory relief, and (5) Flaherty lacks Article III standing to bring claims regarding the toothpastes she did not herself purchase. *See generally* [18-1].

## DISCUSSION

Unlike the Supreme Court, which the Constitution itself establishes, "the inferior Federal courts are creatures of Congress." *Henderson v. Kimmel*, 47 F. Supp. 635, 645 (D. Kan. 1942); *see* U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448–49 (1850); *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245 (1845). Whether to create inferior federal courts generated "disagreement" among the Framers. *Patchak v. Zinke*, 583 U.S. 244, 252 (2018) (plurality opinion). Eventually, however, "[i]n accord with the so-called Madisonian Compromise, Article III, § 1 . . . made the creation of lower federal courts optional with the Congress." *Printz v. United States*, 521 U.S. 898, 907 (1997). Even this compromise left some uneasy. *See, e.g.*, Brutus No. 1 (Oct. 18, 1787), *in* 2 The Complete Anti-Federalist 367 (Herbert J. Storing ed. 1981) (expressing concern that lower federal courts would "swallow up all the powers of the courts in the respective states"). However, the Constitution's proponents reassured voters that the federal judicial power "ha[d] been carefully restricted to those causes which are manifestly proper for the cognizance of the national judicature," and that even in such cases Congress would act sparingly in creating lower federal courts. *See* The Federalist No. 81, at 490 (Alexander Hamilton) (Clinton Rossiter ed., 2003).

In the constitutional system that emerged, "[t]he district courts of the United States are courts of limited jurisdiction." *Badgerow v. Walters*, 596 U.S. 1, 7 (2022); *see Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 10 (1799). Our jurisdiction is "[l]imited first by the Constitution, to only the kinds of 'Cases' and 'Controversies' listed in Article III." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). And it is "limited as well by statute." *Id.*; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("[Federal courts] possess only that power authorized

3

by the Constitution and statute."). Both "[t]he statutory and . . . constitutional elements of jurisdiction are an essential ingredient of the separation and equilibration of powers." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). In addition, they are "informed by concerns for federalism." *Varhol v. Nat'l R.R. Passenger Corp.*, 909 F.2d 1557, 1569 (7th Cir. 1990) (Flaum, J., concurring). *See also McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 535 (7th Cir. 2022) ("A federal court acting without subject-matter jurisdiction violates federalism and separation-of-powers principles underlying our constitutional system.").

This case involves jurisdictional limits of both constitutional and statutory origin. Although courts generally "try to avoid constitutional questions if we can," *United States v. Westmoreland*, 240 F.3d 618, 629 (7th Cir. 2001), it is necessary, for reasons that will soon become apparent, to first discuss Article III's limitations. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[T]here is no mandatory 'sequencing of jurisdictional issues.'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999))).

## I. Standing to Seek Injunctive Relief

In its motion to dismiss, Hello argues (among other things) that Flaherty lacks Article III standing to pursue injunctive relief because she faces no future harm. [18] at 13–14. That puts Hello in a strange position. Having initiated the removal to this court, Hello is "the proponent of federal jurisdiction," and thus bears the burden of establishing standing. *Fox v. Dakkota Integrated Sys.*, 980 F.3d 1146, 1151 (7th Cir. 2020). Yet, by filing a motion to dismiss under Rule 12(b)(1), Hello is also the *opponent* of federal jurisdiction. One might wonder, then, why the question is whether Flaherty—rather than Hello—has standing. After all, the standing inquiry typically focuses on the party to "seek entry to the federal courts for the first time in the lawsuit," whether it be a plaintiff or a defendant. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 618 (1989). But in removal cases, a defendant must show that the case is one "of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a); *see Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n,* 707 F.3d 883, 890 (7th Cir. 2013). Thus, because federal courts lack jurisdiction—original or otherwise—over cases in which the plaintiff lacks standing, removal is not proper unless the plaintiff would have been able to establish standing had she filed in federal court. *See Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018) (per curiam).

Article III "confines" federal jurisdiction "to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). One aspect of the Case-or-Controversy requirement is the doctrine known as "standing," which requires a plaintiff to "have a 'personal stake' in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Standing's basic requirements "are well-known and firmly rooted in American constitutional law." *Id.* at 380. Its "irreducible constitutional minimum . . . contains

4

three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Those elements are "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007).

Among these requirements, injury-in-fact is "[f]irst and foremost." *Steel Co.*, 523 U.S. at 103. That requirement, like the others, must be satisfied "separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). Depending on what relief is sought, the injury must be either "actual" or "imminent." *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). In other words, "the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. A plaintiff seeking only retrospective damages may rely solely on past injuries. *E.g.*, *Landers Seed Co. v. Champaign Nat'l Bank*, 15 F.3d 729, 732 (7th Cir. 1994). However, only "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief." *TransUnion*, 594 U.S. at 435; *see Lyons*, 461 U.S. at 109. Thus, Flaherty may seek injunctive and declaratory relief only if she can demonstrate a sufficient likelihood of future harm.

To do so, she must show that "the risk of harm is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 436. A risk of harm is sufficiently imminent only if the "threatened injury" is "certainly impending." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410 (2013) (quoting *Whitmore*, 495 U.S. at 158). While that does not mean that the harm must be "literally certain," *id.* at 414 n.5, it requires at least "a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Flaherty has not shown any such substantial risk. The injury she alleges stems from her toothpaste purchase in January of 2023. [13] ¶ 13. She alleges that Hello "impaired" her "ability to choose the type and quality of products" she would buy, *id.* ¶ 35, and that she "paid" an increased price, *id.* ¶ 38. On that basis, she asserts that she "has been deprived of her legally protected interest." *Id.* ¶ 36. However, she gives no information suggesting that she will again be deprived of those interests. The only allegations she makes of future activity relate solely to defendant's activities; they in no way connect her to those activities. As such, they do not show that she is the "proper plaintiff to challenge" Hello's ongoing advertising. *See Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015).

To be sure, "past wrongs . . . may be evidence that future violations are likely to occur." *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000); *see Murthy v. Missouri*, 603 U.S. 43, 59 (2024). But that is not so in a case like this, where the alleged harm comes from confusion that has since been dispelled. As the Seventh Circuit explained in *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732 (7th Cir. 2014, where a plaintiff "is now aware of" a defendant's deceptive advertising practices, she "is not likely to be harmed by the practices in the future." *Id.* at 741.

5

To the extent Hello is attempting to trick Flaherty into believing that its toothpastes do not contain sorbitol or xylitol, she will no longer fall for it. "A 'fool me once' plaintiff is not at risk of suffering a future 'fool me twice' injury." *Slowinski v. BlueTriton Brands, Inc.*, No. 24-cv-513, 2024 WL 3757097, at *6 (N.D. Ill. Aug. 9, 2024).[5]

In response, Flaherty cites *Le v. Kohl's Dep't Stores, Inc.*, 160 F. Supp. 3d 1096 (E.D. Wisc. 2016). In *Le*, the court found that an allegation that "a deceptive advertising scheme [was] 'company-wide, pervasive, and continuous'" sufficed to establish standing. 160 F. Supp. 3d at 1109. *Le* relies heavily on the plaintiff's "realistic fear" that the defendant's "misleading marketing scheme will likely continue to cause economic harms *to consumers*." *Le*, 160 F. Supp. 3d at 1111. But the question is not whether future harm to *someone* is imminent; it is whether future harm to *this plaintiff* is imminent. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport

---

[5] This view commands nearly a consensus in this district. *See Slowinski*, 2024 WL 3757097, at *6; *Sanchez v. Walmart Inc.*, No. 23-cv-1297, 2024 WL 2132426, at *5 (N.D. Ill. May 13, 2024): *Wertymer v. Walmart, Inc.*, No. 23-cv-14700, 2024 WL 2117468, at *3 (N.D. Ill. May 9, 2024); *Fleming v. Dr. Squatch, LLC*, No. 22cv-4842, 2024 WL 1676943, at *6 (N.D. Ill. Apr. 18, 2024); *Paulson v. This is L, Inc*, No. 22-cv-04665, 2024 WL 1363663, at *2 (N.D. Ill. March 28, 2024); *Bohen v. ConAgra Brands, Inc.*, No. 23-cv-1298, 2024 WL 1254128, at *5 (N.D. Ill. March 25, 2024); *In re Beyond Meat, Inc., Protein Content Mktg. & Sales Pracs. Litig.*, No. 23-cv-669, 2024 WL 726838, at *4–*5 (N.D. Ill. Feb. 21, 2024); *Bruno v. Am. Textile Co., Inc.,* No. 22-cv-2937, 2023 WL 6976826, at *6 (N.D. Ill. Oct. 23, 2023); *Daly v. FitLife Brands, Inc.*, No. 22-cv-00762, 2023 WL 6388112, at *4 (N.D. Ill. Sept. 29, 2023); *Garza v. Nestle USA, Inc.*, 693 F. Supp. 3d 903, 909 (N.D. Ill. 2023); *Daly v. Glanbia Performance Nutrition, Inc.*, No. 23-cv-933, 2023 WL 5647232, at *5 (N.D. Ill. Aug. 31, 2023); *Curtis v. 7-Eleven, Inc.*, No. 21-cv-6079, 2022 WL 4182384, at *9–*11 (N.D. Ill. Sept. 13, 2022); *Rice v. Dreyer's Grand Ice Cream, Inc.*, 624 F. Supp. 3d 922, 926–27 (N.D. Ill. 2022); *Kinman v. Kroger Co.*, 604 F. Supp. 3d 720, 732 (N.D. Ill. 2022); *Elder v. Bimbo Bakeries USA, Inc.*, No. 3:21-cv-637-DWD, 2022 WL 816631, at *3 (N.D. Ill. March 17, 2022); *Castillo v. Unilever U.S., Inc.*, No. 20-cv-6786, 2022 WL 704809, at *4 (N.D. Ill. March 9, 2022); *Chiappetta v. Kellogg Sales Co.*, No. 21-cv-3545, 2022 WL 602505, at *10 (N.D. Ill. March 1, 2022); *Rudy v. Family Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1167 (N.D. Ill. 2022); *Hayes v. Gen. Mills, Inc.*, No. 19-cv-05626, 2021 WL 3207749, at *5 (N.D. Ill. July 29, 2021); *Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 856–58 (N.D. Ill. 2021); *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 702–03 (N.D. Ill. 2020); *Benson v. Newell Brands, Inc.*, No. 19-cv-6836, 2020 WL 1863296, at *3 (N.D. Ill. Apr. 14, 2020); *Terrazzino v. Wal-Mart Stores, Inc.*, 335 F. Supp. 3d 1074, 1087 (N.D. Ill. 2018); *Benson v. Fannie May Confections Brands, Inc.*, No. 17-cv-3519, 2018 WL 1087639, at *5 (N.D. Ill. Feb. 28, 2018); *Ulrich v. Probalance, Inc.*, No. 16-cv-10488, 2017 WL 3581183, at *7 (N.D. Ill. Aug. 18, 2017); *In re Herbal Supplements Mktg. & Sales Pracs. Litig.*, No. 15-cv-5070, 2017 WL 2215025, at *7–*8 (N.D. Ill. May 19, 2017); *Mednick v. Precor, Inc.*, No. 14-cv-3624, 2016 WL 5390955, at *8–*9 (N.D. Ill. Sept. 27, 2016); *Bohn v. Boiron, Inc.*, No. 11-cv-08704, 2013 WL 3975126, at *3 (N.D. Ill. Aug. 1, 2013).

to represent.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)); *Bohn v. Boiron, Inc.*, No. 11-cv-08704, 2013 WL 3975126, at *3 (N.D. Ill. Aug. 1, 2013) ("[Plaintiff] cannot rely on the prospect that *other* consumers may be deceived by [defendant's] product to show that she has standing to pursue injunctive relief."). Moreover, *Le* is distinguishable because the scheme alleged here is not "company-wide" in the sense that Flaherty does not know which products are mislabeled. In *Le*, "the plaintiff did not know with precision . . . the extent of the deceptive pricing." *Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 857 (N.D. Ill. 2021) (discussing *Le*). Here, by contrast, Flaherty specifically alleges the eighteen products she believes are being deceptively advertised. *See also Daly v. FitLife Brands, Inc.*, No. 1:22-cv-00762, 2023 WL 6388112, at *4 (N.D. Ill. Sept. 29, 2023) (distinguishing *Le* on this ground).[6]

Flaherty's claim for injunctive relief "is based solely on the conjecture that because [Hello] harmed [her] in the past, they are likely to harm [her] in the future." *Camasta*, 761 F.3d at 740. While imminence "is concededly a somewhat elastic concept," it is "stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2. That sort of injury is simply "too speculative for Article III." *Id.*

## II. Effect of Injunction on Amount-in-Controversy

In its notice of removal, Hello identified only one statutory basis for jurisdiction: the general diversity statute, 28 U.S.C. § 1332(a)(1). [1] ¶ 6. At oral argument and in a supplemental brief, Hello now attempts to invoke jurisdiction under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d). *See* [32] at 10–12. Both statutes confer jurisdiction only where an amount-in-controversy requirement is satisfied. *See* 28 U.S.C. § 1332(a) ($75,000 amount-in-controversy requirement for general diversity); *id.* § 1332(d)(2) ($5 million amount-in-controversy requirement under CAFA). In attempting to demonstrate the amount-in-controversy, Hello's notice of removal relied almost entirely on the value of the injunction. [1] ¶¶ 22–33. Thus, it is necessary to determine whether injunctive relief that the court lacks jurisdiction to award nevertheless contributes to the amount in controversy.

In *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006), the Seventh Circuit addressed a similar question. It concluded that, though an insurer's request for a declaratory judgment regarding its duty to indemnify was not yet ripe, the district court erred in not counting "the potential outlay for indemnity" toward the amount in controversy. *Id.* at 539. However, it relied heavily on the ripeness

---

[6] Plaintiff also cites *Muir v. NBTY, Inc.*, No. 15-cv-9835, 2016 WL 5234596 (N.D. Ill. Sept. 22, 2016). But *Muir* seems to have been "premised on the specific fact that the alleged falsity was the *amount* of a particular ingredient, a fact that the plaintiff would not readily be able to discern." *Daly*, 2023 WL 6388112, at *4 (discussing *Muir*). Here, by contrast, Flaherty's claim is about sorbitol and xylitol's *presence*, not their *amount*. *See id.* (distinguishing *Muir* on this ground).

issue being "a question of timing . . . rather than a limit on subject-matter jurisdiction." *Id.* at 538 (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974)). As this distinction suggests, some aspects of ripeness are "drawn . . . from Article III limitations on judicial power" while others are drawn "from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Cath. Soc. Servs.*, 509 U.S. 43, 57 n.18 (1993)).[7] Unlike the Article III requirements, prudential ripeness "is not, strictly speaking, jurisdictional." *Horne v. Dep't of Agric.*, 569 U.S. 513, 526 (2013). In some sense, standing shares this feature. Courts have distinguished constitutional, Article III standing from "prudential" standing, recognizing that only the former is jurisdictional. *See, e.g.*, *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 757 (7th Cir. 2008).[8] But the standing requirement at issue here (the requirement of an injury-in-fact that is actual or imminent) is unquestionably jurisdictional—part of the "irreducible constitutional minimum." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan*, 504 U.S. at 560). Thus, *Meridian* does not resolve the question in this case.

In general, requested injunctive relief may be considered part of the amount in controversy. *See, e.g.*, *Tropp v. W.-S. Life Ins. Co.*, 381 F.3d 591, 595 (7th Cir. 2004). In such cases, "the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977); *see Miss. & Mo. R.R. v. Ward*, 67 U.S. (2 Black) 485, 492 (1862). "[I]n this circuit, the object may be valued from either perspective—what the plaintiff stands to gain, or what it would cost to meet the plaintiff's demand." *Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 799–800 (7th Cir. 2003); *see McCarty v. Amoco Pipeline Co.,* 595 F.2d 389, 393–95 (7th Cir. 1979). However, unlike with damages, a court need not be "certain" that the injunction will be worth less than the statutory minimum; it must instead "place a realistic value on injunctive relief." *Macken*, 333 F.3d at 800. In other words, "the 'good faith' test is not applicable." *City of Milwaukee v. Saxbe*, 546 F.2d 693, 702 (7th Cir. 1976) (citations omitted).

In another context, the Seventh Circuit has held that the categorical unavailability of a particular remedy means that seeking such a remedy does not contribute to the amount in controversy. When determining whether punitive damages are part of the amount in controversy, the Seventh Circuit has explained, "[t]he first question is whether punitive damages are recoverable as a matter of state law." *Cadek v. Great Lakes Dragaway, Inc.*, 58 F.3d 1209, 1212 (7th Cir. 1995). When state law does not permit punitive damages, any request for them does not count toward the amount in controversy. *See Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d

---

[7] In *Susan B. Anthony List*, the Supreme Court questioned "the continuing vitality" of this distinction. 573 U.S. at 167. But that decision post-dates *Meridian* by more than eight years and thus does not shed light on the scope of the Seventh Circuit's holding in *Meridian*.

[8] This distinction, too, has since been called into question. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27 & n.3 (2014).

311, 316 (7th Cir. 1996). Injunctive relief is analogous. Just as a court may not include a request for punitive damages in its calculation when state tort law does not permit the court to award punitive damages, so also a court may not consider a request for injunctive relief when Article III does not permit injunctive relief. "A plaintiff who lacks standing cannot receive an injunction, so it is legally certain that [the defendant's] cost of compliance will be $0." *Garza v. Nestle USA, Inc.*, 693 F. Supp. 3d 903, 909 (N.D. Ill. 2023).

This conclusion also follows from the nature of jurisdictional rules like the Article III standing requirement. When a court lacks jurisdiction over a matter presented to it, the matter is "*coram non judice*"—in other words, legally speaking it is not before the court at all. *See Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 589 U.S. 57, 64 (2020) (per curiam); *see also Mayor v. Cooper*, 73 U.S. (6 Wall.) 247, 250–51 (1867) ("If there was no jurisdiction . . . the matter was as much *coram non judice* as anything else could be . . . ."); *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 204 (1830) (Marshall, C.J.) ("If the jurisdiction does not appear upon the face of the proceedings, the presumption of law is, that the court had not jurisdiction, and the cause was *coram non judice* . . . ."). Because Flaherty's request for injunctive relief is not within the jurisdiction authorized by Article III, it was formally speaking never before the court. It thus cannot have contributed to the amount in controversy.

Counting injunctive relief the court lacks jurisdiction to award toward the amount in controversy would create tension with the well-established premise that the diversity jurisdiction granted in § 1332(a) is narrower than that permitted by Article III. *See, e.g.*, *Jones v. Brennan*, 465 F.3d 304, 307 (7th Cir. 2006) (recognizing that the Judiciary Act of 1789 "conferred on the federal courts a diversity jurisdiction . . . narrower than Article III's definition of the federal judicial power).[9] For example, while Article III requires only minimal diversity, § 1332 has long been understood to require complete diversity. *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530–31 (1967); *see Stawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806). Similarly, the probate and domestic relations exceptions "are of statutory rather than constitutional origin." *Jones*, 465 F.3d at 306. And the amount-in-controversy requirement itself is the product of § 1332(a), not Article III. Some differences (such as the amount-in-controversy requirement) stem from language present in the statute but not in Article III. *See* 28 U.S.C. § 1332(a) (limiting jurisdiction to cases in which "the matter in controversy exceeds the sum or value of $75,000"). Others

---

[9] *See also Rieser v. District of Columbia*, 580 F.2d 647, 656 n.13 (D.C. Cir. 1978) ("[I]n granting the types of jurisdiction envisioned by Article III, Congress has chosen to place restrictions not required by the Constitution, such as a minimum amount in controversy, and its enactments have been judicially interpreted to have placed other restrictions on federal jurisdiction that are likewise not constitutionally required, such as complete diversity."); *cf. Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 807 (1986) (observing that the grant of federal question jurisdiction under § 1331 is narrower than permitted by Article III).

(such as the complete-diversity requirement) are constructions of language not relevant here. *See State Farm Fire*, 386 U.S. at 531. Some, however, are constructions of § 1332(a)'s "civil actions" language (and its predecessors). *See Jones*, 465 F.3d at 307.

In light of this principle, it would be anomalous to conclude that § 1332(a)'s "civil actions" language is *broader* than Article III's "case" or "controversy" language, encompassing relief that is not part of a case or controversy.[10] It would be similarly anomalous to conclude that a pursuit of injunctive relief that is not part of an Article III "controversy" is nevertheless part of the § 1332(a) "matter in controversy." Either assumption is especially fraught given Congress's important role in limiting federal jurisdiction.

Principles of federalism further support this conclusion. Under a contrary rule, plaintiffs could pry open the courthouse door by asking a federal court to award remedies undoubtedly beyond its jurisdiction. For example, a plaintiff who is in fact seeking only nominal damages for purely retrospective harm—which do not satisfy the amount-in-controversy requirement, *see Ind. Hi-Rail Corp. v. Decatur Junction Rwy. Co.*, 37 F.3d 363, 366 (7th Cir. 1994)—could nevertheless make her way into federal court by appending a demand for an injunction, despite the certainty that the injunction would never be awarded. Alternatively, a plaintiff with a claim below the jurisdictional amount could also get into federal court by asserting a right to be compensated for another's injury, in contravention of the rule against third-party standing. *See Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013). Allowing that sort of manipulation would be inconsistent with the limited role of federal courts and the concomitant "presum[ption] that federal courts lack jurisdiction." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

Hello objects that excluding injunctive relief which the court lacks jurisdiction to award violates the "well-established general rule that . . . that jurisdiction is determined at the time of removal." *In re Burlington N. Santa Fe Rwy. Co.*, 606 F.3d 379, 380 (7th Cir. 2010); *see St. Paul Mercury*, 303 U.S. at 293. But that argument misunderstands the principle on which it rests. As articulated in *St. Paul Mercury*, the principle is that "events occurring subsequent to removal which reduce the amount recoverable, whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached." 303 U.S. at 293. So, for example, voluntary dismissal of a claim does not bring the amount-in-controversy below the jurisdictional threshold so as to require remand. *Id.* (citing *Kirby v. Am. Soda Fountain Co.*, 194 U.S. 141 (1904)). Nor does "voluntary reduction of the amount demanded." *Id.* at 294 (citing *Kanouse v. Martin*, 56 U.S. (15 How) 198

---

[10] The supplemental jurisdiction statute, 28 U.S.C. § 1367, seems to assume that all claims in a civil action are part of an Article III case or controversy, asking whether different claims "form part of the same case or controversy under Article III." *Id.* § 1367(a).

(1853)). A change in a party's citizenship that destroys diversity likewise does not defeat jurisdiction. *Id.* at 294–95. And of course, neither does the plaintiff's ultimate "inability . . . to recover an amount adequate to give the court jurisdiction," *id.* at 289, so long as the claim is "not frivolous." *Pratt Cent. Park Ltd. P'ship v. Dames & Moore, Inc.*, 60 F.3d 350, 351 (7th Cir. 1995) (citing *Bell v. Hood*, 327 U.S. 678 (1946)).

But each of those examples involves post-removal developments. Here, there has not been a further development; jurisdiction simply never attached. In arguing otherwise, Hello emphasizes that "subject matter jurisdiction was not contested at the time of Hello's removal." [32] at 6. That is true in only the strictest sense: Hello itself contested the court's jurisdiction to enter an injunction in its very first responsive filing, *see* [11-1] at 12–13, and has continued to do so. But even so, the fact that subject-matter jurisdiction was not contested does not mean that it in fact existed. *See Evergreen Square of Cudahy v. Wisc. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 465 (7th Cir. 2015) ("[T]he parties' united front is irrelevant since the parties cannot confer subject-matter jurisdiction by agreement."). The jurisdictional defect inherent in the demand for injunctive relief existed from the outset. Thus, when we "look at the case as of the time it was filed in state court," we see that it "automatically would have fallen outside the federal courts' 'original jurisdiction.'" *Wisc. Dep't of Corr. v. Schact*, 524 U.S. 381, 390 (1998). Jurisdiction cannot be "ousted" if, as here, it never "attached" in the first place. *See St. Paul Mercury*, 303 U.S. at 293.

Hello's argument essentially boils down to the absence of an immediate order dismissing for lack of jurisdiction. But that is not required. Proponents of federal jurisdiction cannot take shelter in "the state of ignorance that prevails at the moment of filing." *Pratt Cent. Park*, 60 F.3d at 352. "[U]nless some effort to dispel the original state of ignorance is allowed, the limits on federal jurisdiction are unenforceable." *Id.* Indeed, federal courts must sometimes dismiss for lack of subject-matter jurisdiction after years of litigation. *See, e.g.*, *Hart v. Terminex Int'l*, 336 F.3d 541, 541–42 (7th Cir. 2003) ("After eight years in federal court and consideration by four federal judges . . . this case comes before us on appeal. This substantial consumption of federal resources makes it all the more regrettable that we must now order the dismissal of the case for lack of subject matter jurisdiction rendering everything that has occurred in those eight years a nullity.").

The analysis might differ in a case where the request for injunctive relief presents a live controversy at first, but subsequent developments render that controversy moot. After all, the basic concept of mootness is that jurisdiction once acquired has since been lost. *See Walters v. Edgar*, 163 F.3d 430, 432 (7th Cir. 1998) ("If a case becomes moot, the court loses jurisdiction, even though the case was not moot when filed."). In such a case it could be said that "events occurring subsequent to removal" threatened to "oust the district court's jurisdiction once it ha[d] attached." *St. Paul Mercury*, 303 U.S. at 293. Though the *St. Paul Mercury* principle would not save the moot claim in such a circumstance, *Walters*, 163 F.3d at 432, it might save the remaining claims from an amount-in-controversy attack. But here, jurisdiction

11

never "attached" because the court never had jurisdiction to enter an injunction. The fact that a decision to that effect was not instantaneous is irrelevant. *See Pratt Cent. Park*, 60 F.3d at 352.

### III. The General Diversity Statute

Having concluded that the injunctive relief Flaherty seeks does not count toward the amount-in-controversy requirement, it remains to evaluate whether Hello can nevertheless establish federal jurisdiction. In its notice of removal, Hello identifies only one statutory basis of jurisdiction: diversity jurisdiction under 28 U.S.C. § 1332(a)(1). *See* [1] ¶ 6. "Diversity jurisdiction requires (1) complete diversity of citizenship between the plaintiffs and the defendants, and (2) an amount in controversy that exceeds $75,000, exclusive of interest and costs." *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 950 (7th Cir. 2020). Here, the complete-diversity requirement is met, leaving in question only the amount-in-controversy requirement.[11]

"The court applies state law to decide whether more than $75,000 is in controversy." *Sykes v. Cook Inc.*, 72 F.4th 195, 207 (7th Cir. 2023). Illinois law does not allow plaintiffs to recover damages under multiple theories for the same injury. *See Ill. Sch. Dist. Agency v. Pac. Ins. Co.*, 571 F.3d 611, 615–16 (7th Cir. 2009). Thus, unless one theory standing by itself satisfies the amount-in-controversy requirement, jurisdiction under § 1332(a) is improper. Importantly, when a putative class action invokes jurisdiction under § 1332(a) (as opposed to § 1332(d)), only the representative party's claims—that is, Flaherty's—count toward the amount-in-controversy requirement. *Del Vecchio v. Conseco, Inc.*, 230 F.3d 974, 977 (7th Cir. 2000); *see Snyder v. Harris*, 394 U.S. 332, 335 (1969). A corollary of this rule is that amounts not directly attributable to one plaintiff as opposed to another—such as punitive damages and attorney's fees—must be apportioned on a pro rata basis in computing the amount in controversy. *See W.C. Motor Co. v. Talley*, 63 F. Supp. 3d 843, 850 (N.D. Ill. 2014) (collecting cases).

"When a defendant removes to federal court . . . its plausible and good faith estimate of the amount in controversy establishes jurisdiction unless it is a 'legal certainty' that the plaintiffs' claim is for less than the requisite amount." *Webb v. Fin. Indus. Regul. Auth.*, 889 F.3d 853, 859 (7th Cir. 2018) (quoting *St. Paul Mercury*, 303 U.S. at 289). Neither party has ever provided an estimate of the amount in controversy. In its notice of removal, Hello relies almost entirely on its costs of complying with an injunction. [1] ¶¶ 22–33. For the reasons discussed above, that

---

[11] According to the notice of removal, Flaherty is a citizen of Illinois and Hello is an LLC, the only member of which is a Delaware corporation with its principal place of business in New York. [1] ¶ 17–19; *see Qin v. Deslongchamps*, 31 F.4th 576, 579 (7th Cir. 2022) (explaining that an LLC is a citizen of every state where one of its members is a citizen, and that a corporation is a citizen of the state where it is incorporated and the state where it has its principal place of business).

will not suffice. In its supplemental brief, Hello adds an alternative set of arguments that the amount-in-controversy requirement is satisfied. But these arguments misunderstand the mechanics of the amount-in-controversy calculation.

First, Hello argues that the possibility of punitive damages forecloses finding to a legal certainty that Flaherty's claims are not worth $75,000. [33] at 7–8. "Where punitive damages are required to satisfy the jurisdictional amount in a diversity case, a two-part inquiry is necessary." *Cadek*, 58 F.3d at 1211–12. First, the court asks "whether punitive damages are available as a matter of state law." *Id.* at 1212. For at least one of Flaherty's claims—under ICFA—the answer is yes. *See Smith v. Prime Cable of Chi.*, 276 Ill. App. 3d 843, 858 (1995). Thus, the question is whether "it is clear 'beyond a legal certainty that the plaintiff would under no circumstances be entitled to recover the jurisdictional amount.'" *Cadek*, 58 F.3d at 1212 (quoting *Risse v. Woodard*, 491 F.2d 1170, 1173 (7th Cir. 1974)). But when, as here, "a claim for punitive damages makes up the bulk of the amount in controversy," the court must "scrutinize that claim closely." *Anthony*, 75 F.3d at 315.

Hello points to cases where courts upheld punitive damages awards of millions of dollars in ICFA cases.[12] [33] at 8. But the key factor in assessing the amount of punitive damages is the ratio of punitive to compensatory damages, not the raw punitive damages amount. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996). In each of these cases the compensatory damages award was drastically higher (and thus the ratio drastically lower) than would be required to reach the jurisdictional minimum here. *See Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 623 (N.D. Ill. 2019) ($3 million in punitive damages compared to $82,000 in compensatory damages, for a ratio of 36.6 to 1); *Hammer v. Residential Credit Sols., Inc.*, 2015 WL 7776807, at *1 ($1.5 million in punitive damages compared to $500,000 in compensatory damages, for a ratio of 3 to 1). Here, even assuming that Flaherty overpaid by $25 for a single tube of toothpaste, a ratio like the one in *Saccameno* would net her only $915 in punitive damages. Pushing the ratio any higher would raise serious constitutional concerns. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (observing that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process").

This case is akin to both *Anthony* and *Munro v. Golden Rule Ins. Co.*, 393 F.3d 720 (7th Cir. 2004). In both cases, the Seventh Circuit found that, though punitive damages were available under state law, they were insufficient to confer jurisdiction. In *Anthony*, the court reasoned that the necessary ratio of $17.35 in punitive damages for every $1 in compensatory damages "stretches the normal ratio, and would face

---

[12] Hello also cites *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241 (11th Cir. 2016), which did not involve an ICFA claim. However, the ratio there was in line with the ICFA cases Hello cites: $3 million in punitive damages compared to $500,000 in emotional distress damages and $6,000 in compensatory damages. *Id.* at 1246.

13

certain remittitur." 75 F.3d at 317–18. And in *Munro*, the court found it legally certain that a plaintiff could not close the gap between the $7,215.01 in potential compensatory damages and the $75,000.01 jurisdictional minimum using punitive damages. 393 F.3d at 721–22. Likewise, the district court in *W.C. Motor Co.* was unwilling to assume a ratio of more than 34 to 1. 63 F. Supp. 3d at 850. The ratio necessary to reach the jurisdictional minimum here would dwarf those rejected in these cases.

Next, Hello relies on Flaherty's attorney's fees. [33] at 8–9. Attorney's fees are available under ICFA, *see* 815 ILCS 505/10a, and the Seventh Circuit has considered them in calculating the amount in controversy in other ICFA cases. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 512 (7th Cir. 2006). However, only fees incurred prior to removal count toward the amount in controversy. *See ABM Sec. Servs., Inc. v. Davis*, 646 F.3d 475. 479 (7th Cir. 2011). Hello does not attempt to estimate the amount of attorney's fees Flaherty incurred prior to removal, let alone support it by evidence, as required "when the plaintiff contests, or the court questions, the defendant's allegation." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014). Accordingly, it has not proffered the "competent proof" necessary to support jurisdictional facts. *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010); *see McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936). Moreover, Hello does not acknowledge the need to apportion the attorney's fees across all members of the putative class. *See W.C. Motor Co.*, 63 F. Supp. 3d at 850.

Finally, Hello points to a portion of the amended complaint which it says demonstrates that Flaherty is seeking to recover for herself (i.e., not on behalf of the purported class) all profits Hello made from sales of the allegedly deceptive toothpastes. [33] at 9–10. But in one of the cases on which Hello relies, the court found it "doubtful that [the plaintiff] could force [the defendant] to cough up *all* of its profits from the sale of" the allegedly deceptive product. *Oshana*, 472 F.3d at 512 (emphasis in original). Rather than endorsing the theory Hello suggests, *Oshana* cast aspersions on it (though, admittedly, the court did not have occasion to definitively reject it). *See id.* The other case, *Cleary v. Phillip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011), makes no mention of the amount-in-controversy requirement and only observes in a footnote that the complaint "specifically request[ed] all revenue." *Id.* at 514 n.1. Neither case supports the proposition that Flaherty could herself seek disgorgement of Hello's other sales even if the case did not proceed as a class action. And the cited portion of the amended complaint specifically seeks only "the revenues derived from *Plaintiff's* purchase." [13] ¶ 79. A defendant cannot "relabel the unjust enrichment claim set out in" the complaint "to divert the focus of the action from each plaintiff's claim to [the defendant's] aggregate potential liability." *Ivory v. Merck & Co., Inc.*, 341 F. Supp. 2d 1054, 1057 (N.D. Ill. 2004).

In sum, Hello has never offered an explanation that is consistent with the law regarding amount-in-controversy calculations. But even if it had, it would have been a legal certainty that Flaherty's claims do not exceed $75,000. Even astoundingly

14

generous assumptions cannot clear the jurisdictional floor. For example, the court could assume:

>    (1) that the class in fact consists of only 1000 members (as opposed to the "thousands, if not millions" Flaherty estimates, [13] ¶ 50), giving Flaherty the maximum possible apportioned share of the punitive damages and attorney's fees;
>    (2) that Flaherty paid $25 for the single tube of toothpaste she purchased;
>    (3) that the toothpaste was in fact worthless (making the entire $25 compensable as damages);
>    (4) that a jury would be willing to grant (and the court willing to approve) punitive damages of $1500 for every $1 in actual damages (resulting in an enormous $37.5 million punitive damages award);
>    (5) that a team of ten lawyers began working on this case the same day Flaherty purchased the toothpaste and each reasonably billed eighteen hours per day (on this case and no others) seven days a week until Hello filed its notice of removal; and
>    (6) that a reasonable fee for those hours is $2500 per hour (or $36.45 million in total).

But even in that case, the amount in controversy would be $73,975—a healthy sum, to be sure, but still short of the statutory minimum. The court cannot countenance a more generous set of assumptions—especially when no party has been willing to proffer them.

In sum, the claims over which this court has jurisdiction do not present an amount in controversy sufficient to invoke this court's jurisdiction under § 1332(a).

## IV.  The Class Action Fairness Act of 2005

At argument and in its supplemental brief, Hello argued that jurisdiction is proper under CAFA. As compared with the general diversity statute, CAFA imposes a much higher amount-in-controversy requirement: the amount must "exceed[] . . . $5,000,000." *Id*. § 1332(d)(2). However, unlike the general diversity statute, CAFA allows "the claims of the individual class members [to] be aggregated to determine whether the matter in controversy exceeds" $5 million. *Id*. § 1332(d)(6); *see also Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 165 (2014). Thus, it provides a more promising path to jurisdiction in cases like this one, where there are a large number of putative class members but each member's claim is relatively small. However, the court need not decide whether Hello *could* have properly invoked removal jurisdiction under CAFA, because Hello *did* not do so.

"Jurisdictional objections cannot be forfeited or waived." *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 718 (7th Cir. 2012). The same is not true, however, of jurisdictional invocations. To the contrary, a party may lose the benefit of a

jurisdictional statute by not properly invoking it. *See Gavin v. AT&T Corp.*, 464 F.3d 634, 641 (7th Cir. 2006); *see also Travelers Prop.*, 689 F.3d at 718 (holding that courts "need not bend over backwards to construct alternative theories to persuade itself that subject matter jurisdiction exists"). That is precisely what happened here.

"Removal must be effected within thirty days after a defendant receives a copy of the state court complaint, or is served, whichever occurs first." *N. Ill. Gas Co. v. Airco Indus. Gases*, 676 F.2d 270, 273 (7th Cir. 1982). And the notice of removal must contain "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). The notice "may be amended freely within the thirty day period." *N. Ill. Gas Co.*, 676 F.2d at 273. After that, however, "[a]lthough the Seventh Circuit has not squarely addressed the issue, several other courts have held that a defendant may not amend its notice of removal after the 30-day limit . . . to remedy a substantive defect." *Stein v. Sprint Commc'ns*, 968 F. Supp. 371, 375 (N.D. Ill. 1997) (collecting cases).

In general, the distinction between substantive and merely technical defects is whether the amendment invokes a ground for jurisdiction imperfectly or neglects to invoke it at all. *See id.* Thus, "where jurisdiction is apparent from the face of the notice of removal, although imperfectly pleaded, a party may amend its notice of removal to state the basis for the district court's jurisdiction." *Borne v. New Orleans Heath Care, Inc.*, 116 B.R. 487, 491 (E.D. La. 1990). However, "where the jurisdictional base is not apparent from the face of the notice of removal, an amendment to add new jurisdictional allegations concerning that jurisdictional base will be denied as untimely." *Id.*

To be sure, "§ 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure." *Dart Cherokee*, 574 U.S. at 89. And that standard does not require a party to plead legal theories. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). Thus, it may be that the notice of removal does not need to identify the legal theory justifying federal jurisdiction. *See Armada Coal Exp., Inc. v. Interbulk, Ltd.*, 726 F.2d 1566, 1568 (11th Cir. 1984) (exercising jurisdiction "because federal diversity jurisdiction, while imperfectly pled, [was] apparent from the face of the removal petition"). But it must "provide[] the facts from which jurisdiction can be determined." Wright & Miller, 14C Fed. Prac. & Proc. Juris. § 3733 (4th ed.). Hello's notice of removal failed to do so. Nowhere does it suggest that the amount in controversy exceeds $5 million, or that the number of plaintiffs is at least 100—both prerequisites for CAFA jurisdiction. *See* 28 U.S.C. § 1332(d)(2); *id.* § 1332(d)(5)(B).

V.  **Remedy**

Ordinarily, the proper response to a lack of subject-matter jurisdiction is dismissal without prejudice. *Lauderdale-El v. Ind. Parole Bd.*, 35 F.4th 572, 576 (7th Cir. 2022); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that

16

it lacks subject-matter jurisdiction, the court must dismiss the action."); *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. And this is not less clear upon authority than upon principle."). That is the remedy Hello requests on the claims for injunctive relief. *See* [18-1] at 13 ("Plaintiff's prayer for injunctive or declaratory relief must be dismissed because she lacks standing to seek prospective relief.").

In cases that arrive in the federal courts via removal, however, the proper course is to remand to the state court in which the case originated. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Thompson v. Arny & Air Force Exch. Serv.*, 12 F.4th 831, 835–36 (7th Cir. 2025); *McIntyre v. Fallahy*, 766 F.2d 1078, 1082 (7th Cir. 1985) ("If the case did not belong in federal court at all, it should be remanded rather than dismissed."). Thus, the court will remand this case to the Circuit Court of Cook County.

## CONCLUSION

The court lacks subject-matter jurisdiction over this case. The case is therefore remanded to the Circuit Court of Cook County. The pending motion to dismiss, [18], is denied as moot. Civil case terminated.

Dated: March 31, 2025 /s/ Martha M. Pacold

17